**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

In re:

**VINTAGE FOOD SERVICES, INC.,**　　　　Case No.　22-48073-tjt
　　　　　　　　　　　　　　　　　　　　**Chapter 11**
　　**Debtor.**　　　　　　　　　　　　**Hon. Thomas J. Tucker**

---

## DEBTOR'S PLAN OF REORGANIZATION

### INTRODUCTION

Vintage Food Services, Inc., as Debtor and Debtor-in-Possession in the above-styled case ("Vintage" or the "Debtor"), by and through its attorneys, Strobl PLLC, proposes the following Plan of Reorganization (the "Plan") pursuant to 11 U.S.C. §§ 1190 and 1191. The Plan is presented to you to inform you of the proposed reorganization of the Debtor and distribution to creditors and to seek your vote to accept the Plan.

As a Creditor, your acceptance of this Plan is extremely important to the Debtor. You are encouraged to carefully review the full text of this Plan, including all exhibits and attachments, before deciding how to vote on the Plan. In addition to casting your vote to accept or reject the Plan, you may object to confirmation of the Plan. If you wish to object, you must do so by February 21, 2023. Your ballot stating how you are voting on the Plan must be returned by February 21, 2023. The ballot must be forwarded to Lynn M. Brimer by either mailing such ballot to

the following address: Lynn M. Brimer, Strobl PLLC, 33 Bloomfield Hills Parkway, Ste. 125, Bloomfield Hills, Michigan 48304; or emailing the ballot to lbrimer@strobllaw.com.

A hearing on confirmation of the Plan is scheduled for March 8, 2023, at 11:00 a.m. The hearing will be on the record and will be conducted telephonically. At least five minutes before the schedule time for the hearing, counsel and parties should call (888) 684-8853 and use Access Code 2388650. Counsel and parties should place their phone on mute and wait until the case is called before unmuting their phone and participating in the hearing. Your rights may be affected by this Plan. You should consider discussing the Plan with an attorney.

**ARTICLE I**
**HISTORY OF THE BUSINESS OPERATIONS OF THE DEBTOR**

### 1.1    Nature of the Debtor's Business

Vintage is a full-service banquet facility offering three beautiful banquet rooms accommodating groups from 50 to 400. Since its inception, Vintage has developed a reputation for hosting corporate events, fundraisers, reunions, funeral luncheons, sports banquets, and bar/bat mitzvahs with a specialty in weddings and showers. Vintage currently operates under the assumed names of Vintage House Banquets and Catering and Vintage Gardens Weddings & Events Center.

## 1.2    History of the Business Operations of the Debtor

Vintage was organized in March 2007 for the purpose of acquiring an existing banquet hall's operations located in Fraser Michigan. At the same time, ADJ Properties, LLC ("ADJ") was organized with the intent of purchasing the existing facility's real estate located at 31816 Utica Rd, Fraser Michigan ("31816 Utica Rd"), which is comprised of the banquet hall and the adjacent parking lot.

In order to take advantage of an adjacent piece of property that became available in 2013, ALJ Properties, LLC ("ALJ") was organized for the purpose of purchasing the property located at 31490 Utica Rd, Fraser Michigan with the vision of constructing a wedding chapel to compliment the banquet facilities ("31490 Utica Rd").

In 2017, Vintage began construction on the wedding chapel. The construction faced significant budget overruns due to infrastructure deficiencies that were not identified until the construction commenced. Ultimately, construction of the chapel required the replacement of storm sewers and the watermain, and laying a completely new parking lot.

Funding for the construction was financed thru The Huntington National Bank ("Huntington" or the "Bank") and was guaranteed by the Small Business Administration ("SBA"). The construction cost totaled approximately $1.6

3

million. Despite significant cost overruns and delay, in June 2018, the wedding chapel opened operating as Vintage Gardens Wedding Chapel & Events Center.

During the construction of the chapel, Huntington refinanced the ADJ real estate and the acquisition cost of 31490 Utica Rd and secured all of its loans with an all asset filing on Vintage as well as mortgages on both 31816 and 31490 Utica Rd.

In 2018 and 2019, the Vintage's banquet operations and newly constructed wedding chapel generated sufficient revenue to support its debt structure, including the cost over runs on the construction, and were profitable. In fact, the opening of the wedding chapel led to a record year for Vintage, booking 240 weddings and 150 receptions, in addition to its traditional events. Early in 2020, Vintage was forecasting a 25% increase in bookings over 2019. Unfortunately, in March 2020 the COVID-19 pandemic hit and all operations ceased as a result of the government shutdowns. Operations did not fully resume until June 2021.

### 1.3    Events Leading to the Filing of the Debtor's Chapter 11 Case

The COVID-19 pandemic had a devastating impact on Vintage. Governor Whitmer's Executive Orders were particularly strict on bar and banquet operations, as the CDC determined that any establishment that offered indoor dining and bar service presented high risk of spreading COVID-19. As such, Vintage was shut

down from March 2020 through June 2021 with only a short period of reopening from September 2020 to November 2020, during which time Governor Whitmer's Executive Orders imposed significant and costly restrictions.

In response to the shutdown orders, Vintage made efforts to increase its catering business to keep its employees working and to generate revenue to support continue operations and service its debt. In addition, Vintage rented tents to host events in its parking lot. This cost was significant and only resulted in 4 weddings before large outdoor gatherings were also shut down under Governor Whitmer's Executive Orders.

Early in the pandemic Vintage received an initial $10,000.00 grant from the SBA. Vintage submitted a request directly to the SBA for an Economic Injury and Disaster loan ("EIDL Loan") and received an EIDL Loan in the amount of $150,000.00. A request for an increased funds under the EIDL program was denied. Vintage received two loans through the Paycheck Protection Program in the total amount of $400,000.00 through Huntington (the "PPP Loans"). Both PPP Loans have been forgiven by the SBA. Vintage also submitted a request for stimulus funds under the Restaurant Revitalization Fund (the "RRF Program") thru the SBA. However, funding for the program was exhausted prior to Vintage's request being processed and it did not receive any funds under the RRF Program.

After reopening in June 2021, Vintage slowly started rebooking weddings and events. However, revenue for 2021 was down 40% from 2019. As a result of continuing cash shortages stemming from the pandemic, Vintage, ADJ, and AJL were unable to meet all of their obligations due to Huntington. On April 8, 2022, the Debtor and Huntington entered into a Forbearance Agreement with a maturity date of August 15, 2022. The Forbearance Agreement required Vintage, ADJ, and ALJ to execute a consent order appointing a receiver in the event of a default.

During the forbearance period, Vintage engaged Thomas Hospitality Group, Inc., to market the operating business and associated real estate for sale. Vintage entered into a purchase agreement with a potential purchaser for a purchase price sufficient to satisfy all of the Debtor's obligations. However, the potential purchaser was unable to secure financing necessary to close and withdrew from the transaction in July 2022.

Despite continued negotiations, Huntington and the Debtor, ADJ, and ALJ were unable to reach an agreement to extend the terms of the Forbearance Agreement. On August 17, 2022, Huntington filed a Summons and Complaint in the Macomb County Circuit Court along with a motion for the entry of the Consent Order Appointing Receiver. The Debtor, ADJ, and ALJ determined that if a receiver was appointed existing bookings may likely be cancelled, future sales

6

would be lost, and employees would leave. Consequently, the Debtor, ADJ, and ALJ made the prudent business decision to continue operations as debtors in possession and on October 16, 2022, Debtor commenced this voluntary case under Chapter 11, Subchapter V of the Bankruptcy Code. Also on October 16, 2022, ALJ and ADJ commenced separate voluntary Chapter 11 proceedings styled as *In Re: ADJ Properties, LLC* (Case No. 22-48074-tjt) and *In Re: ALJ Properties, LLC,* (Case No. 22-48075-tjt).

### 1.4    Legal Structure of the Ownership of the Debtor

The Debtor is a Michigan corporation formed in March 2007. Debtor's sole shareholder is Anthony A. Jekielek ("Jekielek").

### 1.5    Debtor's Assets/Liquidation Analysis

In order to evaluate the Plan, Creditors must consider the liquidation analysis of the Debtor's assets. On the Petition Date, the Debtor owned personal property assets consisting of the following:

    a.    Vehicles and Furniture;
    b.    Liquor License;
    c.    Equipment used in the operation of its business; and
    d.    Goodwill and ongoing operations.

All of Debtor's personal property assets are collateral for the Debtor's obligations to Huntington Bank. The Debtor has estimated that in an orderly liquidation on the Petition Date, its assets had a total value of approximately $950,775.60 with

7

secured claims totaling $3,604,501.10, including equipment financing totaling $16,800.00.

The Debtor has made certain assumptions regarding the value of its collateral. The Debtor's tangible personal property was appraised by Miedema Appraisals on March 5, 2020. The Debtor has determined that the auction value in March 2020 fairly represents the current market value of its personal property given the additional 33 months of continued use and depreciation.

Debtor has continued to operate during this Chapter 11 proceeding and has successfully converted its booked events into revenue that was not available on the Petition Date. This additional post-petition revenue was not available to the Debtor's estate or creditors on the Petition Date and is not included in the hypothetical liquidation analysis.

Based on the foregoing, on the Petition Date there was value in the Debtor's assets and the ALJ and ADJ real estate sufficient to satisfy the secured claims of Huntington, the SBA, and Financial Pacific Leasing, Inc., and to allow for a distribution to the general Unsecured Creditors.

The Debtor's liquidation analysis is attached as **Exhibit D**.

### 1.6    Debtor's Liabilities and Prepetition Transactions

### A.    The Huntington National Bank

i.    Huntington Bank extended credit to the Debtor as evidenced by the following described promissory notes:

a.    **Note I**.    ADJ and Vintage are indebted to the Bank pursuant to a Promissory Note dated June 30, 2017 in favor of the Bank in the principal amount of $1,756,000.00 ("Note I").

b.    **Note II**.    Vintage is indebted to the Bank pursuant to a Promissory Note dated September 13, 2017 in favor of the Bank in the principal amount of $210,000.00 ("Note II").

c.    **Note III.**    Vintage is indebted to the Bank pursuant to a Promissory Note dated June 18, 2020 in favor of the Bank in the principal amount of $75,000.00 ("Note III").

d.    **Note IV**.    ALJ and Vintage are indebted to the Bank pursuant to a Promissory Note dated March 14, 2018 in favor of the Bank in the principal amount of $1,584,200.00 ("Note IV").

ii.    **Security for Repayment of the Indebtedness.**    As security for the repayment of the Notes and all other Indebtedness, the Debtor and/or Guarantors executed the following documents:

a.    **The Guaranties.**

a.a    **Note I Guaranties.**    Commercial Guaranty dated June 30, 2017, executed by Jekielek in favor of Bank, guaranteeing the repayment of the Indebtedness of ADJ and Vintage pursuant to Note I ("**Guaranty I**"). Commercial Guaranty dated June 30, 2017, executed by ALJ in favor of Bank, guaranteeing the repayment of the Indebtedness of ADJ and Vintage pursuant to Note I ("**Guaranty II**").

a.b    **Vintage Guaranties.**    Commercial Guaranty dated September 13, 2017, executed by ADJ in favor of Bank, guaranteeing the repayment of the Indebtedness of Vintage ("**Guaranty III**"). Commercial Guaranty dated September 13, 2017, executed by ALJ in

favor of Bank, guaranteeing the repayment of the Indebtedness of Vintage ("**Guaranty IV**"). Commercial Guaranty dated September 13, 2017, executed by Jekielek in favor of Bank, guaranteeing the repayment of the Indebtedness of Vintage ("**Guaranty V**").

a.c  **ALJ and Vintage Guaranties.**  Commercial Guaranty dated June 30, 2017 executed by ADJ in favor of Bank, guaranteeing the repayment of the Indebtedness of ALJ and Vintage ("**Guaranty VI**"). Commercial Guaranty dated June 30, 2017, executed by Jekielek in favor of Bank, guaranteeing the repayment of the Indebtedness of ALJ and Vintage. ("**Guaranty VII**").

b.  **The Mortgages.**

b.a  **The 31816 Utica Rd. Mortgage.**  Mortgage executed by ADJ in favor of Bank, dated June 30, 2017, encumbering real property situated in Fraser Michigan, commonly known as 31816 Utica Rd. (the "**31816 Utica Rd. Property**"), recorded on July 6, 2017 by the Macomb County Register of Deeds in Liber 24810, page 879 (the "**31816 Utica Rd. Mortgage**").

b.b  **The 31490 Utica Rd. Mortgage.**  Mortgage executed by ALJ in favor of Bank, dated March 14, 2018, encumbering real property situated in Fraser, Michigan, commonly known as 31490 Utica Rd. (the "**31490 Utica Rd. Property**"), recorded on March 20, 2018 by the Macomb County Register of Deeds in Liber 25266, page 126 (the "**31490 Utica Rd. Mortgage**").

b.c  **The 2164 and 2174 Bauman Road Mortgage.** Mortgage executed by Anthony and Lizabets Jekielek f/k/a Lizbeth Ibisaj in favor of Bank, dated June 30, 2017, encumbering real property situated in Columbus, Michigan, commonly known as 2164 and 2174 Bauman Rd.  (the "**2164 and 2174 Bauman Rd. Property**"), recorded on July 7, 2017 by the St. Clair County Register of Deeds in Liber 4847, page 97 (the "**2164 and 2174 Bauman Road Mortgage**").

iii.    **The Security Agreements.**

a.    Security Agreement dated June 30, 2017, executed by ADJ in favor of the Bank ("**Security Agreement I**"), granting the Bank a security interest in all of its business assets, as described therein.

b.    Security Agreement dated March 14, 2018, executed by ALJ in favor of the Bank ("**Security Agreement II**"), granting the Bank a security interest in all of its business assets, as described therein.

c.    Security Agreement dated June 30, 2017, executed by Vintage in favor of the Bank (the "**Security Agreement III**"), granting the Bank a security interest in all of its inventory, chattel paper, accounts, and general intangibles.

d.    Security Agreement dated September 15, 2017, executed by Vintage in favor of the Bank (the "**Security Agreement IV**"), granting the Bank a security interest in certain vehicles, plus all products and proceeds, as described therein.

e.    Security Agreement dated August 7, 2017, executed by Anthony Jekielek in favor of Bank (the "**Security Agreement V**"), granting the Bank a security interest in a 2017 Can Am, as described therein.

iv.    **Small Business Administration.**

a.    Note I and Note IV are guaranteed by the Small Business Administration.

B.    **Financial Pacific Leasing, Inc.**

Vintage entered into an Equipment Finance Agreement dated October 8, 2018 with respect to specific equipment: (2) Combi Oven, Gas Alto-Shaam Combitherm CT Performance, (2) Combi Oven/steamer unit, with Combismoker OptionCombi (2) recessed

door, for CTP7-20 & CTC7-20 (1) Stacking Hardware, 7-10 or 7-20G (1) Mobile Stacking Base (1) Convection over double deck NAT Gas Silverstar Southbend (1) caster Set 5inch Southbend (2) w/Brake in the amount of $80,086.80.

### C. The SBA

On May 18, 2020 Vintage received an SBA Economic Injury Disaster Loan ("EIDL Loan") in the amount of $150,000.00. On the Petition Date, the balance due on the EIDL Loan was $164,917.81.

### 1.6.1 Priority claims

On the Petition Date, the Debtor's unpaid priority claims consisted of the following:

1.6.1.1 Unpaid wage claims of its employees and independent contractors entitled to priority under section 507(a)(4) of the Bankruptcy Code. The Debtor has paid its priority wage and independent contractor claims pursuant to the Court's Order Authorizing Debtor (A) to Pay Pre-Petition Wages, Salaries, Benefits, and Continue Existing Employee Policies; (B) to Pay Independent Contractor Obligations; and (C) to Continue in Effect Workers' Compensation Programs entered on November 2, 2022 [Docket No. 41].

1.6.1.2 As of the Petition Date, the Debtor had number of unfiled monthly sales tax returns due to the State of Michigan, Department of Treasury (the "Department of Treasury") for prepetition periods. All unfiled returns have been submitted to the Department of Treasury. The Debtor estimates that the unpaid

pre-petition priority sales tax due to the Department of Treasury total approximately $332,829.53 excluding interest. The unpaid pre-petition priority tax claims, including statutory interest, will be paid in full through the Plan payments.

### 1.6.2 **Unsecured Claims**

The Debtor's unsecured claims are comprised of the Debtor's trade claims due to its vendors and the unsecured nonpriority portion of the State of Michigan's sales tax claims. The Debtor's general unsecured claims total approximately $253,541.62. The Department of Treasury also has a general unsecured claim against the Debtor for the penalties and associated interest in connection with the Debtor's unpaid 2017 through 2022 sales taxes.

### 1.6.3 **Guaranteed Debt**

On the Petition Date, the Debtor guaranteed the obligations of ALJ and ADJ as outlined in Section 1.6(A)(ii)(a).

### 1.7 **Current and Historical Financial Conditions**

The current financial records of the Debtor are believed to be reliable. A summary of three (3) years of financial data is attached hereto as **Exhibit A,** consisting of the Debtor's prior three full calendar years.

The Debtor has continued to operate through these Chapter 11 proceedings for the benefit of its customers and creditors. The Debtor filed monthly operating

reports reflecting post-petition income and expenses. The Debtor's Operating Statements for each month post-petition are attached as **Exhibit C.** A summary of Debtor's Post-Petition Income and Expenses as reported on the post-petition operating reports is attached as **Exhibit D**.

### 1.8 Significant Events During the Bankruptcy Case

### 1.8.1 Cash Collateral

In order to continue operations, preserve the value of its assets and operations for its estate and creditors, and to successfully restructure, it was necessary for the Debtor to use its cash collateral securing the prepetition obligations to Huntington Bank and Financial Pacific. On October 27, 2022, the Debtor filed its First Day Motion Pursuant to Sections 105(a), 361, 363, 364, and 552 of the Bankruptcy Code and Bankruptcy Rule 4001(b) for Entry of Interim and Final Orders (A) Authorizing Use of Cash Collateral, (B) Granting Adequate Protection, and (C) Scheduling A Final Hearing on the Motion (the "Cash Collateral Motion") [Docket No. 21]. On November 2, 2022, the Court conducted a hearing and entered an Interim Order (A) Authorizing Use of Cash Collateral, (B) Granting Adequate Protection; and (C) Scheduling a Final Hearing on the Motion (the "Interim Cash Collateral Order") [Docket No. 43]. The Interim Cash Collateral Order addressed Huntington's secured claims, provided adequate

protection to Huntington in the form of monthly payments in the amount of $14,726.00 and to Financial Pacific Leasing, Inc. ("Financial Pacific") in the form of monthly payments in the amount of $1,335.00, and granted replacements liens to both Huntington and Financial Pacific in the same amount and to the same extent and priority as such existed on the Petition Date, thereby allowing the Debtor to continue to operate post-petition.

A final hearing on the Cash Collateral Motion was scheduled for November 30, 2022. No objections were filed to the Cash Collateral Motion or to the Interim Cash Collateral Order. The Interim Order became a final order on November 30, 2022.

### 1.8.2 Sale of Debtor's Assets and ADJ and ALJ Real Estate

Pre-Petition, Vintage engaged Thomas Hospitality Group, Inc., ("THG") to market the operating business and the ADJ and ALJ real estate for sale. In late 2021, Vintage entered into a purchase agreement with a potential purchaser for a purchase price sufficient to satisfy all of the Debtor's obligations. However, the potential purchaser was unable to secure financing necessary to close and withdrew from the transaction in July 2022.

Post-Petition, Vintage has continued its efforts to market and sell the Debtor's assets and the ADJ and ALJ real estate. In November 2022, THG

recommended engaging AW Properties Global of Northbrook Illinois ("AW Properties Global") as a co-listing agent in order to expand the scope of its marketing efforts. AW Properties Global has a national reach focusing on specialized assets with the ability to issue weekly e-blasts to its national brokers, investors, and real estate professionals. In addition, AW Properties Global has instituted target marketing to hospitality groups. To ignite renewed interest, the Debtor authorized AW Properties Global to lower the asking price from $4.5 million to $4.3 million. There has been significant interest at the reduced price and the Debtor is confident that it will successfully sell its assets with the ADJ and ALJ real estate for the benefit of its creditors.

### 1.9 Projected Recovery of Avoidance Actions

### 1.9.1 Preference Claims

The Debtor has reviewed its prepetition transfers made within the preference period and has not identified any potential preference claims.

All payments made to creditors during the 90 days prior to the Petition Date were ordinary course payments, prepayments, or subject to the new value exception.

16

The Debtor reserves the authority to pursue through an adversary proceeding any preference claim that has not been identified. Any such proceeds recovered after confirmation will be used to fund the obligations under this plan.

### 1.9.2 Insider Transactions

The Debtor's insiders consist of Anthony Jekielek, ADJ, and ALJ (collectively, the "Insiders"). During the twelve months prior to the Petition Date, the distributions made to the Insiders were ordinary course compensation payments or reimbursements for expenses of the Debtor.

## ARTICLE II
## SUMMARY OF THE PLAN

This Plan of Reorganization proposes to pay the Debtor's creditors from the revenue generated by the Debtor's continued operations, and the identification and resolution of any Chapter 5 causes of action and ultimate sale of the Debtor's assets and the ADJ and ALJ real estate. The Plan provides for the distribution to creditors of the Debtor's disposable income over a period of three (3) years. The Debtor's Projections are attached at **Exhibit B**. The Plan establishes three (3) groups and six (6) classes of claims. The Plan provides for full payment of administrative expenses, the secured claims of Huntington Bank, the SBA, and Financial Pacific. The Debtor's unsecured creditors, including the Debtor's trade creditors shall receive a distribution of ten (10%) percent over the term of the Plan.

The Debtor's Insiders and equity security holders will receive no recovery under this Plan. Debtor's sole shareholder shall retain his equity interest.

All creditors and equity security holders should refer to Articles III through V of this Plan for information regarding the precise treatment of their claim. Your rights may be affected. You should read these papers carefully and discuss them with your attorney, if you have one. (If you do not have an attorney, you may wish to consult one.).

## ARTICLE III
## CLASSIFICATION OF CLAIMS AND INTERESTS

### 3.1 Unimpaired Interests

**3.1.1 Group I:** Group I shall consist of administrative claims against the Debtor, including professional fees incurred during the Chapter 11 proceeding, which shall be paid in full, in cash, on the Effective Date or as soon thereafter as funds become available.

3.1.1.1 The Debtor is not aware of any unpaid administrative claim due to any of its trade vendors.

3.1.1.2 Debtor anticipates that on the Effective Date, professional fees will be due to Debtor's counsel, Strobl PLLC ("Strobl"), in the approximate amount of $85,000.00 and to Debtor's accountants Gordon Advisors, P.C., in the amount of

$10,000.00.  The Debtor estimates that on the Confirmation Date the Subchapter V Trustee's fees will be approximately $5,000.00.

3.1.1.3  The Group I claims are unimpaired.

**3.1.2  Group II:**  Group II shall consist of the secured claim of SBA in connection with the EIDL Loan.  Payments were scheduled to begin under the EIDL Loan in November 2022 at the rate of $ 731.00 per month.

3.1.2.1  The Debtor will begin making monthly payments to the SBA in connection with the EIDL Loan in the amount of $731.00 beginning on fifteenth day of the first full month after confirmation and continuing on the fifteenth day of each consecutive month until the EIDL Loan is paid in full.

3.1.2.2   In the event the Debtor successfully sells its assets post-confirmation, the EIDL Loan will be paid in full from the proceeds of the sale after the satisfaction of the Class II claim of  the Bank.

3.1.2.3  The EIDL Loan will accrue interest at the rate of 3.75% .

3.1.2.4 The SBA Group II claims are not impaired.

**3.1.3  Group III:**  Group III consists of the pre-petition unsecured priority tax claims of the Department of Treasury for unpaid sales tax for the years 2017 through 2022.  The Group III claims include the portion of the Department of Treasury's claims entitled to priority under 11 U.S.C. § 507(a)(8).

3.1.3.1  The Debtor estimates that Department of Treasury's Group III pre-petition unsecured priority tax claim totals approximately $332,829.53 plus interest.

3.1.3.2 The Group III claims will be paid in full within thirty-six (36) months of the Petition Date in equal monthly payments beginning with the first full month after the Confirmation Date.

3.1.3.3  The Group III claims will accrue interest at the statutory interest rate applicable to the priority tax claims as of the Confirmation Date.

3.1.3.4.  The Debtor reserves the right to object to Treasury's priority claim, including claims as reflected in Debtor's schedules.  There shall be no pre-payment penalty in the event the Debtor's are able to pre-pay any or all of the Group III claims.

3.1.3.5  The Group III claim is not impaired.

**3.2  <u>Impaired Classes</u>**

**3.2.1  <u>Class I:</u>**  Class I shall consist of the arrearage claims of the executory contract holders of the Debtor, to the extent such exist at the time of Confirmation. The Debtor does not believe that there are any executory contract arrearage claims.

3.2.1.1 To the extent there are any unpaid executory contract arrearage claims on the Confirmation Date, such Class I claims will be paid in full on the Effective Date.

**3.2.2** **Class II:** Class II shall consist of the secured claim of Huntington Bank. On the Petition Date, Huntington had a secured claim in the approximate amount of $3,612,642.47. Since the Petition Date, the Debtor has made monthly adequate protection payments to Huntington in the amount of $14,726.00 which will continue through the Confirmation Date.

3.2.2.1 The Class II claim shall be paid in full as follow:

(a) twenty-four (24) monthly payments beginning in the first full month after the Confirmation Date in the amount of $21,784.00 paid on the first day of each month.

(b) the remaining balance shall be paid in full on the earlier of the twenty-fifth (25th) full month after the Confirmation Date or from the proceeds of the sale of Debtor's assets, and the ADJ and ALJ real estate.

3.2.2.2 Huntington shall receive the non-default interest rate as set forth in the Huntington Loan Documents as of the Petition Date.

3.2.2.3 There shall be no prepayment penalty in the event the Debtor is able to prepay any or all of the Class II secured debt owed to Huntington.

3.2.2.4  Huntington shall retain its liens in the same priority and to the same extent as such existed on the Petition Date until its Class II claim is paid in full.

3.2.2.5  The Huntington Class II claim is deemed impaired.

**3.2.3  <u>Class III:</u>**  Class III shall consist of the secured claim of Financial Pacific Leasing, Inc.  The Debtor entered into an Equipment Financing Agreement with Financial Pacific for the purchase of equipment in the amount of $80,068.80 dated October 11, 2018 (the "Financial Pacific Agreement").  As of the Petition Date, the balance due to Financial Pacific was approximately $16,800.00.

3.2.3.1  Financial Pacific shall be paid in full as follows:

(a)  Post confirmation equal monthly payments in the amount of $1,334.48 beginning on the fifteenth (15th) day of the first full month after the Confirmation Date until paid in full.

3.2.3.2  All  payments made by the Debtor to Financial Pacific after the Petition Date and prior to the Confirmation Date shall be deemed to be adequate protection payments for the Debtor's use of the equipment securing the Financial Pacific secured claim.

3.2.3.3  The terms of the Financial Pacific Financing Agreement that have not been modified herein shall remain in full force and effect.

22

3.2.3.4 There shall be no prepayment penalty in the event the Debtor is able to prepay any or all of the Class III secured claim of Financial Pacific.

3.2.3.5 Financial Pacific shall retain its lien in the same priority and to the same extent as such existed on the Petition Date until its Class III claim is paid in full.

3.2.3.6 In the event the Debtor successfully sells its assets after the Confirmation Date, the outstanding balance due on the Financial Pacific claim shall be paid in full, on the earlier of the twenty-fifth (25th) full month after the Confirmation Date or from the proceeds of the sale.

3.2.3.7 The Debtor's account with Financial Pacific shall be deemed current as of the Confirmation Date.

3.2.3.8 Financial Pacific's Class III claim is deemed impaired.

**3.2.4 Class IV:** Class IV shall consist of the secured claims of the City of Fraser Treasurer ("City of Fraser") in connection with past due water and sewer services for the property located at 31816 Utica Rd. The Class IV claims total approximately $7,210.02. The Class IV claim shall be paid in full as follows:

3.2.4.1 The City of Fraser's Class IV claim shall be paid in full over thirty-six (36) equal monthly payment commencing on the fifteenth day of the first month after the Confirmation Date.

3.2.4.2 The Class IV claims will accrue interest at the statutory rate as of the Confirmation Date.

3.2.4.3 The Debtor reserves the right to object to the City of Fraser's secured claim including the claims as reflected in the Debtor's schedules.

3.2.4.4 The City of Fraser shall retain its secured position with respect to the property located at 31816 Utica Road, to the same extent and in the same priority as on the Petition Date, until its respective claim has been paid in full.

3.2.4.5 There shall be no pre-payment in the event the Debtor is able to pre-pay any of all of Class IV secured property tax claims.

3.2.4.6 The City of Fraser's Class IV claim is deemed impaired.

**3.2.5 Class V:** Class V shall consist of the allowed General Unsecured Claims of Creditors of the Debtor, other than the claims of the Debtor's insiders, to the extent such exist, including the Debtor's trade creditors. On the Petition Date, Debtor's general unsecured claims totaled approximately $253,541.62. In

addition, the Department of Treasury has a Class V unsecured claim for the unsecured penalties associated with the priority sales tax claims.

3.2.5.1  The Debtor shall pay the allowed general unsecured claims a pro rata ten percent (10%) distribution in twelve (12) equal quarterly distributions beginning on the last business day of the first full calendar quarter after the confirmation date and continuing on the last business day of each consecutive calendar quarter until paid in full.

3.2.5.2  Any Class V General Unsecured Claim that was identified as disputed, unliquidated, or contingent in the Debtor's Schedules shall be deemed disallowed unless such Creditor holding a claim identified as disputed, unliquidated, or contingent has timely filed a Proof of Claim.

3.2.5.3  There shall be no prepayment penalty in the event the Debtor is able to prepay any or all of any of the Class V general unsecured claims.

3.2.5.4  The Class V Creditors shall be impaired.

**3.2.6   Class VI:**  Class VI shall consist of the Debtor's sole shareholder, Anthony Jekielek equity claims.  Jekielek shall retain its equity interest in the Debtor post confirmation.

3.2.6.1  The Class VI claims shall be impaired.

Payments to be made pursuant to this Plan shall be from funds generated through the operation of the Debtor's business and in the event of the sale of Debtor's assets and the ADJ and ALJ real estate, the proceeds therefrom.

The Debtor will not make any payments and will not incur any debts that impair the Debtor's ability to comply with the terms and conditions of this Plan.

## ARTICLE IV
## DEFAULT

4.1     Other than as set forth in paragraphs 4.2 and 4.3, upon the failure of the Debtor to make any payment due under this Plan which is not cured within sixty (60) days of the mailing of a written notice of default to the Debtor and Debtor's counsel, such Creditor may seek appropriate relief from this Court.

4.2     Upon the failure of the Debtor to make any payment due under this Plan to Huntington, which is not cured within thirty (30) days of the mailing of written notice of default to the Debtor and Debtor's counsel, Huntington may seek relief from this Court.

4.3     In the event of a conversion of this case to a Chapter 7 proceeding, all property of the Debtor, Debtor-in-Possession, or Reorganized Debtor, including all property which will re-vest in the Reorganized Debtor pursuant to Confirmation of the Plan of Reorganization, and all property acquired by the Reorganized Debtor subsequent to Plan confirmation, shall be property of the Chapter 7 Estate.

## ARTICLE V
## EXECUTORY CONTRACT CLAIMS

5.1     Unless otherwise assumed or rejected by the Final Order of the Bankruptcy Court, all executory contracts of the Debtor shall be deemed rejected.

5.2     Any Creditor who has a Claim as a result of any rejected executory contract shall have thirty (30) days after the Confirmation Date to file a Proof of Claim.  In the event such creditor fails to file a claim, such claim shall be deemed disallowed in its entirety.

5.3     The Debtor may file an objection to any Proof of Claim filed pursuant to this Article IV in accordance with Article XVI.

## ARTICLE VI
## FUNDING AND IMPLEMENTATION OF THE PLAN

6.1     This Plan shall be funded through the operation of the Debtor's business and the proceeds of the Debtor's post-petition accounts receivable and in the event of the sale of the Debtor's operating assets and the ADJ and ALJ real estate, the proceeds therefrom shall be distributed first to the secured creditors and then to satisfy any remaining payments due to the priority unsecured creditors, and finally to the balance due on the distributions owed to the general unsecured creditors.  If all Classes of Impaired Creditors vote to accept the Plan, the Debtor shall fund the obligations of the Plan pursuant to its terms.  If a Class of Impaired

Creditors does not vote to accept the Plan, the Debtor reserves the right to amend the Plan.

6.2     Upon the Effective Date, unless otherwise released by the Plan, the Reorganized Debtor shall have, and is hereby assigned standing to pursue any and all Causes of Action, including Avoidance Actions, that have not been fully liquidated as of the Effective Date.

6.3     Any services performed or expenses incurred by any professional on behalf of the Debtor or the Reorganized Debtor with respect to this Case after the Confirmation Date shall not be subject to the prior review and approval of the Court.   All fees and expenses of the Reorganized Debtor arising after the Confirmation Date shall be billed directly to the Reorganized Debtor and shall be paid by the Reorganized  Debtor in the ordinary course of business.

**ARTICLE VII**
**<u>TAX CONSEQUENCES</u>**

7.1     Debtor is unable at this time to fully determine the effect that the proposed Reorganized Plan will have upon its tax attributes.  Debtor recommends that the Creditors consult their tax specialist relative to the tax consequences of the Plan to the Creditors.

7.2     No ruling has been sought or obtained from the IRS with respect to any of the tax aspects of the proposed Plan and no opinion of counsel has been

obtained by the Debtor with respect thereto. No representations or assurances are being made with respect to the federal income tax consequences as described herein. Certain types of claimants and interest holders may be subject to special rules not addressed in this summary of federal income tax consequences.

## ARTICLE VIII
## LEGAL REQUIREMENTS

### A.     Voting Procedures

Under the Bankruptcy Code, the only classes that are entitled to vote to accept or reject a plan are classes of claims, or equity interests, which are impaired under the plan. Accordingly, classes of claims or interests that are not impaired are not entitled to vote on the plan.

Creditors that hold claims in more than one (1) impaired class are entitled to vote separately in each class. Such a creditor will receive a separate ballot for all its claims in each class (in accordance with the records of the Clerk of the Court) and should complete and sign each ballot separately. A creditor who asserts a claim in more than one (1) class and who has not been provided with enough ballots may photocopy the ballot received and file multiple ballots.

Votes on the plan will be counted only with respect to claims: (a) that are listed on the Debtor's Schedules of Assets and Liabilities other than as disputed, contingent, or unliquidated; or (b) for which a proof of claim was filed on or before

29

the bar date set by the Court for the filing of proofs of claim (except for certain claims expressly excluded from that bar date or which are allowed by Court order). However, any vote by a holder of a claim will not be counted if such claim has been disallowed or is the subject of an unresolved objection, absent an order of the Court allowing such claim for voting purposes pursuant to 11 U.S.C. § 502 and Bankruptcy Rule 3018.

Voting on the plan by each holder of a claim or interest in an impaired class is important. After carefully reviewing the plan, each holder of such a claim or interest should vote on the enclosed ballot either to accept or to reject the plan, and then return the ballot by mail to the Debtor's attorney by the deadline previously established by the Court.

Any ballot that does not appropriately indicate acceptance or rejection of the plan will not be counted.

A ballot that is not received by the deadline will not be counted.

If a ballot is damaged, lost, or missing, a replacement ballot may be obtained by sending a written request to the Debtor's attorney.

**B**.  <u>**Acceptance**</u>

The Bankruptcy Code defines acceptance of a plan by an impaired class of claims as acceptance by the holders of at least two-thirds in dollar amount, and

more than one-half in number, of the claims of that class which actually cast ballots. The Bankruptcy Code defines acceptance of a plan by an impaired class of equity interests as acceptance by holders of at least two-thirds in number of the equity interests of that class that actually cast ballots. If no creditor or interest holder in an impaired class votes, then that class has not accepted the plan.

**C.** <u>**Confirmation**</u>

11 U.S.C. §§ 1129(a) and 1129(b) establish conditions for the confirmation of a plan. These conditions are too numerous and detailed to be fully explained here. Parties are encouraged to seek independent legal counsel to answer any questions concerning the Chapter 11 process.

Among the several conditions for confirmation of a plan under 11 U.S.C. § 1129(a) are these:

1.  Each class of impaired creditors and interests must accept the plan, as described in paragraph A above.

2.  <u>Either</u> each holder of a claim or interest in a class must accept the plan, <u>or</u> the plan must provide at least as much value as would be received upon liquidation under Chapter 7 of the Bankruptcy Code.

**D.**    **Modification**.

The Debtor reserves the right to modify or withdraw the plan at any time before confirmation.

**E.**    **Effect of Confirmation**

If the plan is confirmed by the Court:

1.    Its terms are binding on the debtor, all creditors, shareholders, and other parties in interest, regardless of whether they have accepted the plan.

2.    Except as provided in the plan and in 11 U.S.C. § 1141(d):

   (a) In the case of a <u>corporation</u> that is reorganizing and continuing business:

      (1)    All claims and interests will be discharged.

      (2)    Creditors and shareholders will be prohibited from asserting their claims against or interests in the debtor or its assets.

   (b) In the case of a <u>corporation</u> that is liquidating and not continuing its business:

      (1)    Claims and interests will not be discharged.

      (2)    Creditors and shareholders will not be prohibited from asserting their claims against or interests in the debtor or its assets.

32

(c)  In the case of an individual or husband and wife:

    (1)    Claims will be discharged, except as provided in 11 U.S.C §§ 523 and 1141(d). Unless the Court orders otherwise, the discharge will be entered only after completion of plan payments as provided in Section 1141(d)(5)(a). It is the usual practice of the Court to close Chapter 11 cases after confirmation, then the individual debtor files a motion to reopen the case for entry of discharge upon completion of plan payments.

    (2)    Creditors will be prohibited from asserting their claims except as to those debts which are not discharged or dischargeable under 11 U.S.C. §§ 523 and 1141(d).

## ARTICLE IX
## CONSEQUENCES OF DENIAL OF CONFIRMATION OF PLAN

9.1    If the Court fails to confirm the Plan, this Chapter 11 proceeding may continue and the Debtor may seek confirmation of an amended or modified Plan. Alternatively, the Debtor's Chapter 11 case may be converted to a Chapter 7 liquidation case or this proceeding may be dismissed.

## ARTICLE X
## RIGHT OF WITHDRAWAL

10.1    Debtor reserves the right to withdraw, otherwise amend, or modify this Plan prior to confirmation.

## ARTICLE XI
## DEFINITIONS

As used in this Plan, the following terms shall have the meanings specified below, unless the context requires otherwise:

**11.1** "Administrative Claim" means costs and expenses of administration of the Case allowed under sections 503(b) and 507(a)(1) of the Bankruptcy Code, and the fees of the United States Trustee under 28 U.S.C. § 1930(a)(6).

**11.2** "Administrative Creditor" shall mean any Creditor entitled to payment of an Administrative Expense.

**11.3** ADJ shall mean ADJ Properties, LLC, the debtor in the Chapter 11 proceeding pending in the Bankruptcy Court for the Eastern District of Michigan styled as *In re ADJ Properties, LLC* (Case No. 22-48074-tjt).

**11.4** ALJ shall mean ADJ Properties, LLC, the debtor in the Chapter 11 proceeding pending in the Bankruptcy Court for the Eastern District of Michigan styled as *In re ALJ Properties, LLC* (Case No. 22-48075-tjt).

**11.5** "Allowed Claim" or "Allowed Interest" means a Claim against or Interest in the Debtor to the extent that:

    A.    A Proof of Claim or Interest was:

    1.    Timely filed;

    2.    Deemed filed pursuant to section 1111(a) of the Code; or

34

3. Filed late with leave of the Bankruptcy Court after notice and an opportunity for hearing given to Debtor, and counsel for Debtor; <u>and</u>

B. The Claim is not a Contested Claim or a Contested Interest, <u>or</u>

C. The Claim is allowed (and only to the extent allowed) by a Final Order of the Bankruptcy Court.

**11.6** "Avoidance Actions" means all claims granted to the Debtor or Reorganized Debtor under sections 544–53 of the Bankruptcy Code.

**11.7** "Ballot" shall mean the official Bankruptcy Form No. 14 or a document prepared to substantially conform to same being sent to all Creditors and parties-in-interest entitled to vote for or against the Plan.

**11.8** "Bank" shall mean The Huntington National Bank.

**11.9** "Bankruptcy Code" or "Code" means the Bankruptcy Reform Act of 1978, as amended (11 U.S.C. §§ 101, <u>et</u> <u>seq</u>.).

**11.10** "Bankruptcy Court" means the United States Bankruptcy Court for the Eastern District of Michigan and any court having jurisdiction over any appeals.

**11.11** "Bankruptcy Rules" or "Rules" means the Federal Rules of Bankruptcy Procedure, as promulgated by the Supreme Court that became effective on August 1, 1991 and any amendments thereto. To the extent applicable, Bankruptcy Rules also refers to the Local Rules of the U.S. District

35

Court for the Eastern District of Michigan, as amended and the Local Bankruptcy Rules for the Eastern District of Michigan, as amended.

**11.12** "Business Day" means any day, other than a Saturday, Sunday, or "Legal Holiday," as that term is defined in Bankruptcy Rule 9006(a).

**11.13** "Case" or "Chapter 11" means the case currently pending before the United States Bankruptcy Court for the Eastern District of Michigan styled as *In re Vintage Food Services, Inc.* (Case No. 22-48073-tjt).

**11.14** "Claim" means any right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, contested, disputed, undisputed, legal, equitable, secured, or unsecured, or any right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, contested, disputed, undisputed, secured, or unsecured.

**11.15** "Class" means a class of holders of Claims or Interests described in Article III of this Plan.

**11.16** "Confirmation Date" means the date upon which the Bankruptcy Court shall enter the Confirmation Order.

**11.17** "Confirmation Hearing" means the hearing conducted by the Bankruptcy Court with respect to the confirmation of the Plan.

**11.18** "Confirmation Order" means the order of the Bankruptcy Court, which confirms this Plan in accordance with the provisions of Chapter 11 of the Bankruptcy Code.

**11.19** "Contested Claim" means any Claim as to which Debtor or any other party in interest has interposed an objection or commenced an adversary proceeding in accordance with the Bankruptcy Code, Bankruptcy Rules and this Plan, which objection has not been determined by a Final Order.

**11.20** "Creditor" means any holder of a Claim against the Debtor.

**11.21** "Department of Treasury" shall mean the State of Michigan, Department of Treasury.

**11.22** "Debtor" means Vintage Food Services, Inc.

**11.23** "Disbursing Agent" shall mean the Debtor. If the Debtor is unable to serve, then the Disbursing Agent shall be the Subchapter V Trustee or an appropriate individual acceptable to the Debtor.

**11.24** "Effective Date" shall mean the sixth (60th) business day after the Confirmation Order becomes a Final Order.

37

**11.25** "EIDL" shall mean the SBA Emergency Injury and Disaster Loan program.

**11.26** "Final Order" means an Order of the Bankruptcy Court as to which (i) the time for appeal has expired and no appeal has been timely taken; or (ii) any timely appeal has been finally determined or dismissed; or (iii) an appeal has been timely taken, but such order has not been stayed within ten (10) days after the filing of such appeal.

**11.27** "Holder" shall mean a Person holding a Claim, Interest, or Lien, as applicable, with respect to the Debtor.

**11.28** "Huntington" shall mean the Huntington National Bank.

**11.29** "Impaired" means a Claim treated under this Plan, unless the Plan:

    (a)    leaves unaltered the legal, equitable, and contractual rights to which such Claim or Interest entitles the holder of such Claim or Interest; or

    (b)    Notwithstanding any contractual provision or applicable law that entitles the holder of such Claim or Interest to demand or receive accelerated payment of such Claim or Interest after the occurrence of a default—

        (1)    cures any such default (other than defaults relating to (i) any penalty interest rate or provision arising from a non-monetary default by the Debtor; (ii) the solvency or financial condition of the Debtor; or (iii) the commencement of this Case) that occurred before or after the commencement of the Case;

(2)    Reinstates the maturity of such Claim or Interest, as such maturity existed before such default;

(3)    compensates the holder of such Claim or Interest for any damages incurred as a result of any reasonable reliance on such contractual provision or such applicable law; and

(4)    Does not otherwise alter the legal, equitable, or contractual rights to which such Claim or Interest entitles its holder.

**11.30** "Insider" means each Anthony Jekielek, ADJ Properties, LLC, and ADJ Properties, LLC.

**11.31** "Insiders" means, collectively, the Insiders.

**11.32** "Interest" means the interests of Debtor as defined in the Code. Interest shall refer to the Debtor's rights to Non-Exempt Assets.

**11.33** "Interest Rate" means (a) with respect to Claims entitled to interest under section 506 of the Bankruptcy Code and this Plan and having an applicable contractual rate of interest, the lowest rate of interest provided in such contract, without regard to any default by Debtor; (b) with respect to all other Claims entitled to interest under the Bankruptcy Code and this Plan, the Prime Rate of Interest as of the Confirmation Date; or (c) with respect to (a) or (b) such other interest rate as may be determined by a Final Order of the Bankruptcy Court.

**11.34** "Jekielek" shall mean Anthony Jekielek.

**11.35** "Non-Exempt Assets" shall refer to any property of the Debtor, which is not exempt pursuant to the Code. Any property which is subject to an allowed lien or encumbrance shall not be considered a Non-Exempt Asset except to the extent that Debtor has any equity in such property.

**11.36** "Petition Date" means the date the Debtor filed this case, which date is October 16, 2022.

**11.37** "Plan" means this Plan of Reorganization, as it may be altered, amended, modified, or supplemented from time to time.

**11.38** "PPP" shall mean the SBA Paycheck Protection Program.

**11.39** "Priority Claim" means a Claim entitled to priority under any section of the Bankruptcy Code except claims specified in section 507(a)(1) of the Code.

**11.40** "Professional Fees" means the fees and reimbursement for disbursements owed to attorneys, financial consultants, accountants, or other professionals of the Debtor whose employment has been approved by the Bankruptcy Court.

**11.41** "SBA" shall mean the United States Small Business Administration.

**11.42** "Secured Claim" shall mean a Claim secured by a lien on property in which the Estate has an interest but only to the extent of the value of the Creditor's

interest in the Estate's interest in such property as of the Petition Date and only if such Secured Claim is Allowed.

**11.43** "Unsecured Claim" means a Claim that is not a Secured Claim and is not an Administrative Claim or a Priority Claim.

**11.44** "Unsecured Creditor" shall mean any Creditor that holds an Unsecured Claim.

**11.45** "Vintage" shall mean Vintage Food Services, Inc., a Michigan corporation.

**ARTICLE XII**
**EFFECT OF CONFIRMATION**

12.1 Confirmation of the Plan shall modify and alter the rights of all Creditors and holders of Interests as provided herein. Creditors or holders of Interests shall be prohibited from asserting any further claims against the property of the Debtor based upon any act, transaction or indebtedness which is the subject matter of any Claim or Interest, or based upon any guarantee of collection, payment or otherwise made by the Debtor as to any obligation of any persons, firm or entity, unless the Plan provides, or the Court specifically orders otherwise. On the Confirmation Date, the assets of the Debtor not otherwise transferred prior to the Confirmation Date, shall re-vest in the Reorganized Debtor.

12.2 On and after the Effective Date, the Reorganized Debtor shall continue its operations in the ordinary course under the terms of this Plan and applicable non-bankruptcy law. The Debtor and Reorganized Debtor shall be authorized to incur the expenses in the ordinary course consistent with the terms of this Plan and, in the Reorganized Debtor's discretion in order to operate in a reasonable fashion in order to meet the terms of this Plan and Debtor's non-bankruptcy obligations.

12.3 Expect as otherwise provided in the Plan, pursuant to the application provisions in the Bankruptcy Code, including but not limited to section 553, and non-bankruptcy law or agreement of the parties, Debtor may set-off against any Allowed Claim and distributions to be made with respect to such allowed Claim, any Claims, rights, and Causes of Action of any nature that the Debtor and/or Reorganized Debtor may hold against the Holder of such Allowed Claim or such Holders' predecessor-in-interest, as applicable, Claimant.

## ARTICLE XIII
## MODIFICATION OF THE PLAN

13.1 After confirmation, the Debtor and Reorganized Debtor may, with leave of the Bankruptcy Court, and upon notice and opportunity for hearing to the affected Creditor(s) only, remedy any defect or omission, reconcile any

inconsistencies in the Plan or in the Confirmation Order or otherwise modify the Plan.

13.2    Only if the Bankruptcy Court determines that the modification affects all the Creditors, or if the Debtor and Reorganized Debtor proposes a material modification affecting all Creditors, shall such modification be governed by section 1127 of the Bankruptcy Code.

## ARTICLE XIV
## JURISDICTION OF THE COURT

14.1    Notwithstanding confirmation of the Plan, the Bankruptcy Court shall retain jurisdiction for the following purposes:

A.    To determine all objections to the allowance of Claims;

B.    To approve or disapprove any compromise by the Debtor of any Claim;

C.    To determine all disputes arising under the Plan, including any dispute over any action taken by the Disbursing Agent, and to enforce, interpret and administer the terms and conditions of the Plan;

D.    To determine any applications for allowance of compensation and reimbursement of expenses as may be required for pre-confirmation services;

E.    To determine any applications for rejection, assumption, or assignment of executory contracts and the allowance of any claims resulting from the rejection thereof or from the rejection of executory contracts pursuant to the Plan;

43

F. To determine any applications, adversary proceedings, and contested and litigation matters pending in the Case at the Confirmation Date or thereafter filed;

G. To determine any applications on file for approval of settlement agreements and entering and enforcing all appropriate orders in connection therewith;

H. To modify any provisions of the Plan pursuant to the Rules, the Code and provisions of the Plan;

I. To correct any defect, cure any omission, or reconcile any inconsistency in the Plan or the Confirmation Order as may be necessary to carry out the purposes and intent of the Plan;

J. To determine such other matters provided in the Confirmation Order as may, from time to time, be authorized under the provisions of the Code or any applicable law;

K. To enforce all orders, judgments, injunctions, and rulings in connection with this proceeding; and

L. To enter such orders that may be necessary or appropriate to aid in confirmation and to facilitate implementation of the Plan.

## ARTICLE XV
## TITLE TO PROPERTY

15. Except for title to the Non-Exempt Assets, all property of the Debtor and Debtor-in-Possession not transferred prior to the Confirmation Date shall vest in the Reorganized Debtor upon Confirmation Date. The Debtor shall be discharged from its status as Debtor and Debtor-in-Possession and the affairs and

business of the Debtor shall thereafter be conducted without Court involvement except as may be governed by Articles XII and XIII of this Plan.

## ARTICLE XVI
## PROOFS OF CLAIMS/OBJECTIONS TO CLAIMS

16.    The Court set a deadline of February 14, 2023, as the bar date for non-governmental proofs of claim to be filed with the Court.  Governmental units are to file proofs of claim one hundred eighty (180) days from the Petition Date.  Except as otherwise set forth in this Plan as an Allowed Claim, the Debtor and Reorganized Debtor may object to the allowance of any Claim, whether listed on the schedules filed by Debtor or filed by any Creditor, on or before the later of (a) sixty (60) days from the date of service of any Proof of Claim upon the Debtor or Reorganized Debtor, or, (b) sixty (60) days after the Effective Date.

## ARTICLE XVII
## MISCELLANEOUS PROVISIONS

17.1  Except as otherwise set forth in this Plan, all the Debtor and Reorganized  Debtor have standing to pursue any and all Avoidance Actions on the behalf of creditors, to the extent such exist and it is in the Debtor's and the Reorganized  Debtor's sound business judgment whether to pursue or waive such actions.

17.2 Any Professional Fees incurred by any professional whose employment required the approval of the Bankruptcy Court during the pendency of the Case, shall from and after the Confirmation Date be paid by the Debtor and Reorganized Debtor without the prior review and approval of the Bankruptcy Court. Notwithstanding any provision of the Bankruptcy Code or Rules, including without limitation Fed. R. Bank. P. 2016, after the Confirmation Date no professional shall be required to disclose payments received from the Debtor or Reorganized Debtor after the Confirmation Date. All fees and expenses arising after the Confirmation Date shall be billed directly to the Debtor and Reorganized Debtor and the Bankruptcy Court shall only review that portion to which the Debtor and Reorganized Debtor object prior to the closing of the cases. The Debtor and Reorganized Debtor shall pay, in accordance with the terms of any invoice with respect to such fees, the portion as to which there is no objection.

17.3 Notwithstanding anything in this Plan to the contrary, the Debtor and Reorganized Debtor shall not be obligated to make any payments towards any Contested Claim. Further, the Debtor shall not be required to make any payments for an Allowed Claim to any Creditor if the Debtor has filed a motion, objection, adversary proceeding, state court proceeding, or other similar notice against such Creditor alleging an objection, claim, cause of action, offset, or counter-claim,

such that if sustained and not paid by such Creditor would result in a disallowance of such Allowed Claim in accordance with section 502(d) of the Code.

17.4  All parties-in-interest, including without limitation any Creditor, shall be required to execute any document reasonably requested by the other to memorialize and effectuate the terms and conditions of this Plan.  This shall include without limitation any execution by Creditors of any UCC or mortgage terminations and releases.

17.5  When the Debtor, Reorganized Debtor, or the Disbursing Agent have made all payments and met all obligations required under this Plan all restrictions, negative covenants, and other limitations on the Debtor and Reorganized Debtor shall terminate.

17.6  Any lien or encumbrance of any Creditor, which is not specifically preserved within this Plan, shall, and hereby is, extinguished, released and terminated.  Any Creditor holding such a lien or encumbrance shall be required to execute any document reasonably requested by the Debtor and Reorganized Debtor to memorialize said termination.  If a Creditor fails to cooperate with the Debtor, the Debtor may seek to enforce this provision within the Bankruptcy Court or, at the Debtor's or Reorganized  Debtor's option, the Debtor may file a certified copy of the Confirmation Order and a copy of this Plan with the appropriate register of

deeds or Secretary of State's office and the filing of the certified Confirmation Order and this Plan shall serve to terminate such lien or encumbrance.

17.7   This Plan and the Confirmation Order shall inure to the benefit of, and be binding upon, all parties in interest and their respective successors and assigns.

**[SIGNATURES ON NEXT PAGE]**

**VINTAGE FOOD SERVICES, INC.,**
a Michigan corporation

By:    */s/   Anthony Jekeliek*
      Anthony Jekeliek
Its:    President

**STROBL PLLC**

*/s/    Lynn M. Brimer*
LYNN M. BRIMER (P43291)
PAMELA S. RITTER (P47886)
ANTHONY M. CIMINI (P86223)
Strobl PLLC
Attorneys for Debtor
33 Bloomfield Hills Parkway, Ste. 125
Bloomfield Hills, MI 48304
Telephone:  (248) 540-2300
Facsimile: (248) 645-2690
E-Mail:    lbrimer@strobllaw.com
            pritter@strobllaw.com
            acimini@strobllaw.com

Dated:  January 17, 2023

*S&B\111759\002\BANKRUPT\SB807502.DOC